TAYLOR *v.* WITHINGTON & COOLEY MANUFACTURING CO.[1]

MASTER AND SERVANT — NEGLIGENT INJURIES — ASSUMPTION OF
RISK.

> A master is not liable to a servant for an injury caused by the
> breaking of an emery belt, where the servant was employed
> with the knowledge that belts were apt to, and often did,
> break, and his work was such that he could know better than
> any one else if the belts were defective, unless the employer
> failed to remedy the defect after his attention was called
> to it.

Error to Jackson; Peck, J. Submitted February 23,
1904. (Docket No. 20.) Decided June 7, 1904.

Case by Albert Taylor against the Withington & Cooley
Manufacturing Company for personal injuries. From a
judgment for plaintiff, defendant brings error. Reversed.

Counsel for appellant have complied with the rule in
making a statement of facts. Its correctness is not chal-
lenged, and we therefore adopt it:

On January 11, 1901, the defendant was, and for many
years had been, operating in the city of Jackson extensive
tool and implement shops. It had a shop inside the State
prison, and one outside. One branch of its work was the
polishing of forks by means of emery belts 15 feet long,
running over wheels or pulleys 2½ feet in diameter. The
combination of belt and wheels will be referred to as the
polishing machine. There were many of these machines
in the prison shop, and eight of them in the outside shop.

The emery belts were of leather, and from 2 to 3½ inches
wide, and were of three kinds,—roughing belts, or belts
used for taking off the rough surface of the forks and for
grinding them down; heeling belts, or narrow belts used

[1]Rehearing denied October 27, 1904.

for grinding the heel of the fork and the angle between the tines; and finishing belts, or lighter belts, with finer emery upon them, used for coloring or polishing the forks. Each operator in the outside shop had a set of from 6 to 11 belts, consisting of roughing, heeling, and finishing belts. This set was given to him new, and he had the exclusive use of them until they were worn out and discarded. They are intended to last about a year.

The belt which broke was an old belt, which had been received by plaintiff when new, and he alone had used it from the time it was given him new until it broke and injured him. He had used it several months. Plaintiff took the belt when new, and put it on the machine, and sandpapered the rough part off, and cut an arrow on the underside, to determine which way it should run on the wheels as to laps; also cut his number on the belt, in order that it might be distinguished from the others. Then the belt was handed over to Mr. Kitcher, referred to in the testimony as repairer or inspector, who put a coat of emery on the belt, and hung it on the peg or rack of the operator to whom the belt belonged, which peg or rack was near the operator's machine; and the operator took the belts off from this peg as he needed them, and put them on his machine for use. The back one of the two wheels could be moved nearer to or farther from the front wheel by means of a screw controlled by the operator, and, "from experience," he learned what tension to put on the belt by means of this screw. They had to be on good and snug in order to polish the forks. The belts of plaintiff ran about 1,000 revolutions a minute.

There was a jack next to the machine, consisting of a rod or lever fastened by a pivot to a stationary post about the height of the top of the machine, or upper part of the belt. On one end of this arm or lever was a spring, attached to the floor, which held that end of the lever down when no pressure was applied to the other. On the other end of the lever was a cord or wire attaching it to a foot treadle, to be used by the operator in exerting a pres-

sure with his foot, so as to pull that end down upon the belt; and to this end of the lever was also attached a hook, used to catch onto a fork; and by this jack or device greater pressure could be exerted upon the belt with the fork by the operator.

New belts would not hold emery as long as old belts. The emery on a belt would last to polish from one fork to three dozen. Every time a roughing belt was used, a new coat of emery had to be put on by Mr. Kitcher, the repairer. A belt could be re-emeried one, two, three, or four times, according to the belt, and then the operator had to chop the emery all off from his belt, after which Kitcher would put on a new coat of emery. In removing the emery, the operator stood behind the rear wheel of his machine, and chopped with a piece of scythe all the emery from the belt; and in doing so the machine was stopped, and the operator pulled the belt with his hand, little by little, and chopped against the rear wheel, until he had pulled the belt clear around, and cleaned off every inch of it.

The belt in question had broken when plaintiff was using it the day before the accident, and, in breaking, it flew out behind his machine, to near where Repairer Kitcher's workbench was; and Kitcher repaired the break in the belt, and emeried it, and hung it on the plaintiff's peg, where, on the morning of January 11, 1901, the plaintiff found it with his other belts; and about 10 a. m. of that day he placed the belt upon his machine, and had not used it over five minutes when it broke (but not in the repaired portion), and forced the fork he was polishing against his right eye, destroying its sight. The belt, as it appeared after the accident, was in evidence at the trial, and showed two coats of emery on it. This proved that it had been cleaned by plaintiff the second time it was used before it broke the last time, and Kitcher had put on a new coat of emery.

The repairer's (Kitcher's) position or bench was about six feet from the plaintiff's machine, and where the plaintiff had an opportunity of seeing what the repairer did

with the belts; saw him emery belts, cut belts up, and repair them.   There were eight polishing machines in the shop where plaintiff worked, numbered from 1 to 8, all similar to plaintiff's machine.   Plaintiff's machine was No. 1, and situated at the north end of the shop.   To the south of him were machines 2, 3, 4, 5, and 6, each exactly like plaintiff's, and directly east of 5 and 6 were machines 7 and 8, similar to the others, only smaller.   Plaintiff, as he worked, stood on the north side of his machine, facing the others, and could see every machine in the shop, unless at times piles of forks hid his view.   He had worked at the machine for over two years and two months, at the same kind of work.   Had seen belts break in that room. Couldn't tell how many.   Admitted that a dozen might have broken on his own machine in two years.   Had heard of only one man being injured by a fork before. Had a fork jerked out of his hands once or twice.   Had seen a belt break and hit the hood of the machine so hard as to break out a piece of the belt.   He was working by the piece.   He did not examine the belt, or look to see if it was safe, before he put it on his machine the morning he was hurt.   When he saw a defect in the belt, he called the repairer's attention to it, and had it fixed.   He knew that defendant used old belts, and knew that belts broke. Admits that, when a belt breaks, there is no telling which way the ends will fly.

One Eugene A. Taylor, plaintiff's witness, a workman of large experience in the same shop at the same time, as well as in another shop, testified that he thought the breaks would average one in two days in the whole shop, or a belt to a machine about every sixteen days,—sometimes oftener.   He had known of their breaking several in a day.   So common were breaks of the belts that planks were put in between the machines for the purpose of preventing belts, when breaking, from flying over to other operators.

One Cameron was the superintendent of the factory, one Morris was foreman, and one Converse showed the men

how to operate the machines. When a belt broke, it made a noise that ordinarily attracted the attention of all the workmen. Whenever a polisher wanted a new belt, he applied to Morris, the foreman, for it.

The negligence complained of by plaintiff was that Mr. Kitcher, being an inspector of belts for defendant, furnished plaintiff with a belt which was too thin, and that Kitcher's negligence was the negligence of the defendant. Plaintiff recovered a verdict.

*Smith & Townsend*, for appellant.

*Richard Price* ( *Charles A. Blair*, of counsel ), for appellee.

GRANT, J. ( *after stating the facts* ). Did the plaintiff assume the risk? The following facts are conceded: Defendant furnished a good, sound belt. The court so instructed the jury. It had furnished a competent repairer, Mr. Kitcher. If it was his duty to inspect the belts, he was entirely competent for that purpose. The business was dangerous. Belts were constantly breaking, but in the many years of the defendant's business but one other person had been injured. To lessen or avoid the danger from breaking belts, planks were put up to prevent their flying and hitting other employés working near. The principal danger arose from the breaking of the belts.

The plaintiff was properly instructed how to do the work. He was an experienced workman. The condition of the belt was clearly as apparent to him as to any one. Belts wore more or less, and did not wear evenly. The strength of the belt did not always depend upon its thickness, but to a considerable extent upon the quality of the leather. All the witnesses, including the plaintiff, testified that, if the belt was thin in places, they knew it at once, because, as the fork was held upon the rapidly revolving belt, it would jump as it struck the thick and thin places. All the witnesses, including plaintiff, state that, when they saw a belt was defective, it was their custom

to call the attention of the repairer to it. It was also a duty which the operators owed to themselves and to their employer. When cleaning the emery from the belt, every inch of it was under the eye and inspection of the operator. If it was thin, he would know it before any one else. Plaintiff testified that he could then determine whether the belt was too thin. Plaintiff's witness Converse, the oldest operator in the shop, testified that there was no one who could see more of the condition of the belt than could the operator when he cleaned it with his scythe. It was both known and understood that the belts wore thin from use. All admit that when, in their judgment, a belt became unfit for use, it was their custom to throw it aside and get a new one from the foreman. It was their duty to do so. Plaintiff made no complaint, either to Kitcher or to the foreman, that the belt was unfit for use.

I think this is clearly one of those cases where the workman assumed the risk. It is not reasonable, in my opinion, to hold that the defendant was responsible for the consequence of breaking belts, when the contract of employment was made with the knowledge and understanding that they were apt to, and did often, break. Before an employé could fasten liability upon the defendant, it was his duty to call the attention of the representative of the defendant to the defect. If then he was not supplied with a new belt, or the old one could not be, and was not, repaired, then the defendant would undoubtedly be liable.

Judgment reversed, and new trial ordered.

The other Justices concurred.